*EXHIBIT "A"*

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| For Prothonotary Use Only (Docket Number) |
|---|
| **FEBRUARY 2021** |
| E-Filing Number: 2102029809 |
| **001548** |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| THAY K. PAW | ARAMARK UNIFORM & CAREER APPAREL, LLC |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 2129 SOUTH 7TH STREET 2ND FLOOR<br>PHILADELPHIA PA 19148 | 2400 MARKET STREET<br>PHILADELPHIA PA 19103 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | ARAMARK UNIFORM & CAREER APPAREL GROUP, INC. |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 2400 MARKET STREET<br>PHILADELPHIA PA 19103 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | ARAMARK , ALIAS: ARAMARK CORPORATION |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 2400 MARKET STREET<br>PHILADELPHIA PA 19103 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 15 | ☒ Complaint   ☐ Petition Action   ☐ Notice of Appeal<br>☐ Writ of Summons   ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☒ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☐ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

**CASE TYPE AND CODE**

20 - PERSONAL INJURY - OTHER

**STATUTORY BASIS FOR CAUSE OF ACTION**

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED PRO PROTHY**<br><br>FEB **17** 2021<br><br>**A. SILIGRINI** | IS CASE SUBJECT TO COORDINATION ORDER?<br>YES          NO |
|---|---|---|

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: THAY K PAW

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| RICHARD K. WASHINGTON | WASHINGTON & WASHINGTON PC<br>1650 MARKET ST |
| PHONE NUMBER | FAX NUMBER | SUITE 3600 |
| (215)925-4300 | (215)925-9180 | PHILADELPHIA PA 19103 |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 67908 | rkw@richardwashington.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| *RICHARD WASHINGTON* | Wednesday, February 17, 2021, 10:49 am |

FINAL COPY (Approved by the Prothonotary Clerk)

## COMPLETE LIST OF DEFENDANTS:

```
1. ARAMARK UNIFORM & CAREER APPAREL, LLC
      2400 MARKET STREET
      PHILADELPHIA PA 19103
2. ARAMARK UNIFORM & CAREER APPAREL GROUP, INC.
      2400 MARKET STREET
      PHILADELPHIA PA 19103
3. ARAMARK
      ALIAS: ARAMARK CORPORATION
      2400 MARKET STREET
      PHILADELPHIA PA 19103
4. PROTECTIVE INDUSTRIAL PRODUCTS, INC.
      968 ALBANY SHAKER ROAD
      LATHAM NY 12110
5. PIP USA MANUFACTURING, INC.
      968 ALBANY SHAKER ROAD
      LATHAM NY 12110
6. WORLDWIDE PROTECTIVE PRODUCTS, LLC
      4255 MCKINLEY PARKWAY
      HAMBURG NY 14075
7. US MESH, INC.
      ALIAS: XUSM, INC.
      170 NEEDHAM STREET
      NEWTON MA 02464
8. PROCESSING SOLUTIONS, LLC
      4255 MCKINLEY PARKWAY
      HAMBURG NY 14075
9. HONEYWELL INTERNATIONAL, INC.
      300 SOUTH TRYON STREET
      CHARLOTTE NC 28202
10. HONEYWELL SAFETY PRODUCTS USA, INC.
      300 SOUTH TRYON STREET
      CHARLOTTE NC 28202
11. JBS USA HOLDINGS, INC.
      1770 PROMONTORY CIRCLE
      GREELEY CO 80634
12. JBS USA, LLC
      1770 PROMONTORY CIRCLE
      GREELEY CO 80634
13. JBS USA FOOD COMPANY HOLDINGS
      1770 PROMONTORY CIRCLE
      GREELEY CO 80634
14. JBS USA FOOD COMPANY
      1770 PROMONTORY CIRCLE
      GREELEY CO 80634
15. JBS S.A.
      AVENIDA BRIG FARIA LIMA 2.3912 ANDAR JD PAULISTANO
      SAO PAULO
```

**WASHINGTON & WASHINGTON, P.C.**
By: Richard K. Washington, Jr., Esquire
Identification No. 67908
Lia X. Washington, Esquire
Identification No. 324187
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 925-4300
Attorneys for Plaintiff

**THIS IS NOT AN ARBITRATION MATTER**

Filed and Attested by the
Office of Judicial Records
17 FEB 2022 10:59 am
A. SILIGRINI

| | | |
|---|---|---|
| THAY KAW PAW, as Administratrix of the | : | COURT OF COMMON PLEAS |
| Estate of Bosco Htoo | : | PHILADELPHIA COUNTY |
| 2129 South 7th Street, 2nd Floor | : | |
| Philadelphia, PA 19148 | : | |
| | : | |
| Plaintiff, | : | Term, 2021 |
| vs. | : | No. |
| | : | |
| ARAMARK UNIFORM & CAREER APPAREL, LLC | : | COMPLAINT – CIVIL ACTION |
| 2400 Market Street | : | |
| Philadelphia, Pennsylvania 19103 | : | |
| | : | |
| and | : | JURY TRIAL DEMANDED |
| | : | |
| ARAMARK UNIFORM & CAREER APPAREL | : | |
| GROUP, INC. | : | |
| 2400 Market Street | : | |
| Philadelphia, Pennsylvania 19103 | : | |
| | : | |
| and | : | |
| | : | |
| ARAMARK A/K/A ARAMARK CORPORATION | : | |
| 2400 Market Street | : | |
| Philadelphia, Pennsylvania 19103 | : | |
| | : | |
| and | : | |
| | : | |
| PROTECTIVE INDUSTRIAL PRODUCTS, INC. | : | |
| 968 Albany Shaker Road | : | |
| Latham, NY 12110 | : | |
| | : | |
| and | : | |
| | : | |

Case ID: 210201548

PIP USA MANUFACTURING, INC.                    :
968 Albany Shaker Road                         :
Latham, NY 12110                               :
                                               :
                    and                        :
                                               :
WORLDWIDE PROTECTIVE PRODUCTS, LLC             :
4255 McKinley Parkway                          :
Hamburg, NY 14075                              :
                                               :
                    and                        :
                                               :
US MESH, INC. A/K/A XUSM, INC.                 :
170 Needham Street                             :
Newton, MA 02464                               :
                                               :
                    and                        :
                                               :
PROCESSING SOLUTIONS, LLC                      :
4255 McKinley Parkway                          :
Hamburg, NY 14075                              :
                                               :
                    and                        :
                                               :
HONEYWELL INTERNATIONAL INC.                   :
300 South Tryon Street                         :
Charlotte, NC 28202                            :
                                               :
                    and                        :
                                               :
HONEYWELL SAFETY PRODUCTS USA, INC.            :
300 South Tryon Street                         :
Charlotte, NC 28202                            :
                                               :
                    and                        :
                                               :
JBS S.A.                                       :
Avenida Brig Faria Lima 2.391 2                :
Andar Jd Paulistano                            :
Sao Paulo, SP 01452-000 Brazil                 :
                                               :
                    and                        :
                                               :

Case ID: 210201548

JBS USA HOLDINGS, INC.                          :
1770 Promontory Circle                          :
Greeley, CO 80634                               :
                                                :
                    and                         :
                                                :
JBS USA, LLC                                    :
1770 Promontory Circle                          :
Greeley, CO 80634                               :
                                                :
                    and                         :
                                                :
JBS USA FOOD COMPANY HOLDINGS                    :
1770 Promontory Circle                          :
Greeley, CO 80634                               :
                                                :
                    and                         :
                                                :
JBS USA FOOD COMPANY                            :
1770 Promontory Circle                          :
Greeley, CO 80634                               :
                    Defendants.                 :

### NOTICE TO DEFENDANT

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the complaint and notice are served, by entering a writ-ten appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

                    PHILADELPHIA BAR ASSOCIATION
                    Lawyer Referral and Information Service
                    1101 Market Street, 11th Floor

Case ID: 210201548

Philadelphia, Pennsylvania 19107
(215) 238-6300

**AVISO**

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas
expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de
la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un
abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en
contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y
puede continuar la demanda en contra suya sin previo aviso o notificacion. Además, la corte
puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de
esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes
para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO
TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO. VAYA EN PERSONA O LLAME POR
TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR
DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACIÓN DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Inforrnacion Legal
1101 Market Street, 11th Floor
Filadelfia, Pennsylvania 19107
(215) 238-6300

Case ID: 210201548

**WASHINGTON & WASHINGTON, P.C.**      **THIS IS NOT AN ARBITRATION MATTER**
**By: Richard K. Washington, Jr., Esquire**
**Identification No. 67908**
**Lia X. Washington, Esquire**
**Identification No. 324187**
**1650 Market Street, Suite 3600**
**Philadelphia, PA 19103**
**(215) 925-4300**
**Attorneys for Plaintiff**

| | | |
|---|---|---|
| THAY KAW PAW, as Administratrix of the | : | COURT OF COMMON PLEAS |
| Estate of Bosco Htoo | : | PHILADELPHIA COUNTY |
| 2129 South 7th Street, 2nd Floor | : | |
| Philadelphia, PA 19148 | : | |
| | : | |
| Plaintiff, | : | Term, 2021 |
| vs. | : | No. |
| | : | |
| ARAMARK UNIFORM & CAREER APPAREL, LLC | : | COMPLAINT -- CIVIL ACTION |
| 2400 Market Street | : | |
| Philadelphia, Pennsylvania 19103 | : | |
| | : | |
| and | : | JURY TRIAL DEMANDED |
| | : | |
| ARAMARK UNIFORM & CAREER APPAREL | : | |
| GROUP, INC. | : | |
| 2400 Market Street | : | |
| Philadelphia, Pennsylvania 19103 | : | |
| | : | |
| and | : | |
| | : | |
| ARAMARK A/K/A ARAMARK CORPORATION | : | |
| 2400 Market Street | : | |
| Philadelphia, Pennsylvania 19103 | : | |
| | : | |
| and | : | |
| | : | |
| PROTECTIVE INDUSTRIAL PRODUCTS, INC. | : | |
| 968 Albany Shaker Road | : | |
| Latham, NY 12110 | : | |
| | : | |
| and | : | |
| | : | |

1

Case ID: 210201548

PIP USA MANUFACTURING, INC.                          :
968 Albany Shaker Road                               :
Latham, NY 12110                                     :
                                                     :
                         and                         :
                                                     :
WORLDWIDE PROTECTIVE PRODUCTS, LLC                   :
4255 McKinley Parkway                                :
Hamburg, NY 14075                                    :
                                                     :
                         and                         :
                                                     :
US MESH, INC. A/K/A XUSM, INC.                       :
170 Needham Street                                   :
Newton, MA 02464                                     :
                                                     :
                         and                         :
                                                     :
PROCESSING SOLUTIONS, LLC                            :
4255 McKinley Parkway                                :
Hamburg, NY 14075                                    :
                                                     :
                         and                         :
                                                     :
HONEYWELL INTERNATIONAL INC.                         :
300 South Tryon Street                               :
Charlotte, NC 28202                                  :
                                                     :
                         and                         :
                                                     :
HONEYWELL SAFETY PRODUCTS USA, INC.                  :
300 South Tryon Street                               :
Charlotte, NC 28202                                  :
                                                     :
                         and                         :
                                                     :
JBS S.A.                                             :
Avenida Brig Faria Lima 2.391 2                      :
Andar Jd Paulistano                                  :
Sao Paulo, SP 01452-000 Brazil                       :
                                                     :
                         and                         :
                                                     :

2

Case ID: 210201548

JBS USA HOLDINGS, INC.                    :
1770 Promontory Circle                    :
Greeley, CO 80634                         :
                                          :
                   and                    :
                                          :
JBS USA, LLC                              :
1770 Promontory Circle                    :
Greeley, CO 80634                         :
                                          :
                   and                    :
                                          :
JBS USA FOOD COMPANY HOLDINGS             :
1770 Promontory Circle                    :
Greeley, CO 80634                         :
                                          :
                   and                    :
                                          :
JBS USA FOOD COMPANY                      :
1770 Promontory Circle                    :
Greeley, CO 80634                         :
                   Defendants.            :

## CIVIL ACTION COMPLAINT

### *Introduction*

1.      This wrongful death and survival action concerns the negligent, reckless, and

outrageous conduct of the JBS Defendants[1], Aramark Defendants[2], PIP Defendants[3] and

Honeywell Defendants[4] because they elected to pursue profits over the safety of beef

processing workers.

---

[1] At times throughout this Complaint, Defendants JBS S.A., JBS USA Holdings, Inc., JBS USA, LLC, JBS USA Food Company Holdings and JBS USA Food Company will be referred to as the "JBS Defendants."
[2] At times throughout this Complaint, Defendants Aramark Uniform & Career Apparel, LLC, Aramark Uniform & Career Apparel Group, Inc., and Aramark a/k/a Aramark Corporation will be referred to as the "Aramark Defendants."
[3] At times throughout this Complaint, Defendants Protective Industrial Products, Inc., PIP USA Manufacturing, Inc., Worldwide Protective Products, LLC, US Mesh, Inc. a/k/a XUSM, Inc., and Processing Solutions, LLC will be referred to as the "PIP Defendants."
[4] At times throughout this Complaint, Defendants Honeywell International Inc. and Honeywell Safety Products USA, Inc. will be referred to as the "Honeywell Defendants."

3

Case ID: 210201548

2.      Bosco Htoo pictured below died on June 13, 2019, from a knife wound to the

base of his neck because Defendants elected to pursue profits over safety ("the incident").



3.      At the time of his death, Mr. Htoo was a meat cutter in the beef fabrication

department at the JBS beef processing plant in Souderton, Pennsylvania.

4.      Mr. Htoo's death was the predictable and preventable result of the Defendants'

decisions to ignore worker safety.

5.      Despite the known risks of working in a meat processing plant prior to June 13,

2019, the JBS Defendants who directly oversaw safety operations at the JBS Souderton plant:

(1) allowed the continued use of dull knives by meat processing workers; (2) failed to select,

approve and require appropriate personal protective equipment ("PPE") for meat processing

workers; and (3) ignored the safety concerns of workers.

Case ID: 210201548

6.      By choosing profits over safety, the JBS, Aramark, PIP and Honeywell Defendants demonstrated a reckless disregard to the rights and safety of workers, including Mr. Htoo.

### *The Parties*

7.      Plaintiff Thay Kaw Paw ("Plaintiff" or "Thay Kaw Paw") is a resident of the Commonwealth of Pennsylvania, and lives at 2129 South 7th Street, 2nd Floor, Philadelphia, PA 19148.

8.      Thay Kaw Paw is the administratrix of the Estate of Bosco Htoo and files this complaint on behalf of the Estate of Bosco Htoo ("Bosco Htoo", "Mr. Htoo," "Decedent," or "Deceased"). See Letters of Administration (June 21, 2019), attached as Exhibit "A".

9.      Defendant Aramark Uniform & Career Apparel, LLC ("Aramark Uniform LLC") is a limited liability company organized under the laws of Delaware and maintains its principal place of business at 2400 Market Street, Philadelphia, Pennsylvania 19103.

10.     Defendant Aramark Uniform & Career Apparel Group, Inc. ("Aramark Uniform Group") is a corporation organized under the laws of Delaware and maintains its principal place of business at 2400 Market Street, Philadelphia, Pennsylvania 19103.

11.     Defendant Aramark, a/k/a Aramark Corporation, ("Aramark") is a corporation organized under the laws of Delaware and maintains its principal place of business at 2400 Market Street, Philadelphia, Pennsylvania 19103.

12.     Upon information and belief, Defendant Aramark Uniform LLC is a wholly-owned subsidiary of Defendant Aramark.

13.     Upon information and belief, Defendant Aramark Uniform Group is a wholly-owned subsidiary of Defendant Aramark.

Case ID: 210201548

14.     At all times relevant to this cause of action, the Aramark Defendants were engaged in business within the Commonwealth of Pennsylvania on a regular, systematic, continuous, and substantial basis.

15.     At all times relevant to this cause of action, the Aramark Defendants regularly conducted business in Philadelphia County.

16.     At all material times, the Aramark Defendants acted by and through their actual agents, apparent agents, ostensible agents, implied agents, servants, partners and/or employees, who were acting within the course and scope of their duties as duly authorized and actual agents, ostensible agents, implied agents, servants, partners, and/or employees of the Aramark Defendants.

17.     Defendant Protective Industrial Products, Inc. ("PIP Inc.") is a corporation organized under the laws of New York and maintains its principal place of business at 968 Albany Shaker Road, Latham, NY 12110.

18.     Defendant PIP USA Manufacturing, Inc. ("PIP USA") is a corporation organized under the laws of New York and maintains its principal place of business at 968 Albany Shaker Road, Latham, NY 12110.

19.     Defendant Worldwide Protective Products, LLC ("Worldwide") is a limited liability company organized under the laws of New York and maintains its principal place of business at 4255 McKinley Parkway, Hamburg, NY 14075.

20.     Defendant US Mesh, Inc. A/K/A. XUSM, Inc. ("US Mesh") is a corporation organized under the laws of Massachusetts and maintains its principal place of business at 170 Needham Street, Newton, MA 02464.

6

21.     Defendant Processing Solutions, LLC ("Processing Solutions") is a limited liability company organized under the laws of North Carolina and maintains its principal place of business at 4255 McKinley Parkway, Hamburg, NY 14075.

22.     Upon information and belief, Defendant PIP USA is a wholly-owned subsidiary of Defendant PIP Inc.

23.     Upon information and belief, Defendant Worldwide is a wholly-owned subsidiary of Defendant PIP USA.

24.     Upon information and belief, Defendant US Mesh is a wholly-owned subsidiary of Defendant Worldwide.

25.     At all times relevant to this cause of action, the PIP Defendants were engaged in business within the Commonwealth of Pennsylvania on a regular, systematic, continuous, and substantial basis.

26.     At all times relevant to this cause of action, the PIP Defendants regularly conducted business in Philadelphia County.

27.     At all material times, the PIP Defendants acted by and through their actual agents, apparent agents, ostensible agents, implied agents, servants, partners and/or employees, who were acting within the course and scope of their duties as duly authorized and actual agents, ostensible agents, implied agents, servants, partners, and/or employees of the PIP Defendants.

28.     Defendant Honeywell International Inc., ("Honeywell International") is a corporation organized under the laws of Delaware and maintains its principal place of business at 300 South Tryon Street, Charlotte, NC 28202.

7

Case ID: 210201548

29.     Defendant Honeywell Safety Products USA, Inc. ("Honeywell Safety Products USA") is a corporation organized under the laws of Delaware and maintains its principal place of business at 300 South Tryon Street, Charlotte, NC 28202.

30.     At all times relevant to this cause of action, the Honeywell Defendants were engaged in business within the Commonwealth of Pennsylvania on a regular, systematic, continuous, and substantial basis.

31.     At all times relevant to this cause of action, the Honeywell Defendants regularly conducted business in Philadelphia County.

32.     At all material times, the Honeywell Defendants acted by and through their actual agents, apparent agents, ostensible agents, implied agents, servants, partners and/or employees, who were acting within the course and scope of their duties as duly authorized and actual agents, ostensible agents, implied agents, servants, partners, and/or employees of the Honeywell Defendants.

33.     Upon information and belief, Defendant Honeywell Safety Products USA is a wholly-owned subsidiary of Defendant Honeywell International.

34.     Defendant JBS S.A. is a corporation organized under the laws of Brazil and maintains its principal place of business at Avenida Brig Faria Lima 2.391 2, Andar Jd Paulistano, Sao Paulo, SP 01452-000 Brazil.

35.     At all times relevant to this cause of action, JBS S.A. was engaged in business within the Commonwealth of Pennsylvania on a regular, systematic, continuous, and substantial basis.

8

Case ID: 210201548

36.     At all times relevant to this cause of action, JBS S.A. regularly conducted business in Philadelphia County.

37.     At all relevant times, JBS S.A. was acting by and through its agents, servants and/or employees, who were acting within the course and scope of their respective agency, service, and employment with JBS S.A.

38.     Defendant JBS USA Holdings, Inc. is a corporation organized under the laws of Delaware and maintains its principal place of business at 1770 Promontory Circle, Greeley, CO 80634.

39.     At all times relevant to this cause of action, JBS USA Holdings, Inc. was engaged in business within the Commonwealth of Pennsylvania on a regular, systematic, continuous, and substantial basis.

40.     At all times relevant to this cause of action, JBS USA Holdings, Inc. regularly conducted business in Philadelphia County.

41.     At all relevant times, JBS USA Holdings, Inc. was acting by and through its agents, servants and/or employees, who were acting within the course and scope of their respective agency, service, and employment with JBS USA Holdings, Inc.

42.     Defendant JBS USA, LLC is a limited liability company organized under the laws of Delaware and maintains its principal place of business at 1770 Promontory Circle, Greeley, CO 80634.

43.     At all times relevant to this cause of action, JBS USA, LLC was engaged in business within the Commonwealth of Pennsylvania on a regular, systematic, continuous, and substantial basis.

9

Case ID: 210201548

44.     At all times relevant to this cause of action, JBS USA, LLC regularly conducted business in Philadelphia County.

45.     At all relevant times, JBS USA, LLC was acting by and through its agents, servants and/or employees, who were acting within the course and scope of their respective agency, service, and employment with JBS USA, LLC.

46.     Defendant JBS USA Food Company Holdings is a corporation organized under the laws of Delaware and maintains its principal place of business at 1770 Promontory Circle, Greeley, CO 80634.

47.     Defendant JBS USA Food Company is a corporation organized under the laws of Delaware and maintains its principal place of business at 1770 Promontory Circle, Greeley, CO 80634.

48.     At all times relevant to this cause of action, JBS USA Food Company Holdings and JBS USA Food Company were engaged in business within the Commonwealth of Pennsylvania on a regular, systematic, continuous, and substantial basis.

49.     At all times relevant to this cause of action, JBS USA Food Company Holdings and JBS USA Food Company regularly conducted business in Philadelphia County.

50.     At all relevant times, JBS USA Food Company Holdings and JBS USA Food Company were acting by and through their agents, servants and/or employees, who were acting within the course and scope of their respective agency, service, and employment with JBS USA Food Company Holdings and JBS USA Food Company.

51.     Upon information and belief, Defendants JBS USA Holdings, Inc. is a wholly-owned subsidiary of Defendant JBS S.A.

10

Case ID: 210201548

52.     Upon information and belief, Defendants JBS USA, LLC  is a wholly-owned

subsidiary of Defendant JBS USA Holdings Inc.

53.     Upon information and belief, Defendant JBS USA Food Company Holdings is a

wholly- owned subsidiary of Defendant JBS USA, LLC.

54.     Upon information and belief, Defendant JBS USA Food Company is a wholly-

owned subsidiary of Defendant JBS USA Food Company Holdings.

### Factual Background

55.     The paragraphs and allegations stated above are incorporated herein by

reference as if the same were set forth fully herein.

#### *Meat Processing Plants*

56.     Meat processing plants are known to be dangerous places to work.

57.     Meat processing plants present unique safety issues because inter alia workers

work side by side using cutting tools and in a dangerous environment.

58.     Meat processing plants have an elevated risk of serious cut trauma to workers'

bodies.

#### *The JBS Defendants*

59.     JBS S.A. a multinational corporation, is the world's largest meat processor.

60.     JBS S.A. based in Sao Paulo, Brazil has a global production and distribution

platform that stretches across 15 countries and manages more than 400 offices and plants on

five continents.

11

Case ID: 210201548

61.     Everywhere JBS S.A. operates, its more than 230,000 team members follow the same company guidelines on issues including food quality and safety and implement best practices throughout the value chain, all of which is backed by the same culture and values.

62.     The JBS Defendants are, collectively, the world's largest meat processor and own and directly oversee safety operations at more than sixty (60) meat processing plants in the United States.

63.     JBS beef products fill the shelves of grocery stores across the United States.

64.     The JBS Defendants' beef processing plant located at 249 Allentown Road, Souderton, PA 18964 ("JBS Souderton plant", "JBS Souderton, Inc.'s plant", "JBS Souderton beef processing plant") has approximately 1,400 workers and specializes in beef processing and packaging.

65.     Every day hundreds of workers report to the JBS Souderton plant floor for work in close proximity.

66.     The president of JBS S.A. directly oversees the safety of JBS employees worldwide including those at the Souderton plant and communicates by email directly with JBS workers worldwide including those at the JBS Souderton plant regarding safety protocols and measures.

67.     A large percentage of the JBS Defendants' workers are immigrants, which results in company-wide communications regularly required to be translated in Spanish, Arabic, and Haitian Creole.

12

Case ID: 210201548

68.    Bosco Htoo was of Karen descent.

69.    Workers stand only a few feet apart and, because of the volume of the machines

at the JBS Souderton plant, are required to stand within inches of each other to communicate.

A typical JBS Souderton plant meat packing and processing line is depicted in the photograph

below:



*JBS Souderton Plant – Workers Injured by Dull And Dropped Knives*

70.    On or about February 9, 2016, a JBS worker sustained a face laceration at the JBS

Souderton plant.

71.    On or about February 12, 2016, a JBS worker sustained a forehead laceration at

the JBS Souderton plant.

72.    On or about March 15, 2016, a JBS worker sustained a laceration from a co-

worker's knife at the JBS Souderton plant.

Case ID: 210201548

73.     On or about May 13, 2016, a JBS worker sustained a laceration from a co-worker's knife at the JBS Souderton plant.

74.     On or about July 20, 2016, a JBS worker sustained an upper right lip laceration at the JBS Souderton plant.

75.     On or about October 14, 2016, a JBS worker reported experiencing right upper extremity pain from using a dull knife while working at the JBS Souderton plant.

76.     On or about December 27, 2016, a JBS worker sustained an upper back puncture/laceration from a co-worker's knife at the JBS Souderton plant.

77.     On or about February 3, 2017, a JBS worker sustained a laceration from a co-worker's knife while working at the JBS Souderton plant.

78.     On or about March 2, 2017, a JBS worker reported experiencing right wrist, thumb and hand pain from the use of dull knives while working at the JBS Souderton plant.

79.     On or about May 8, 2017, a JBS worker sustained a lip laceration while working at the JBS Souderton plant.

80.     On or about June 20, 2017, a JBS worker sustained a laceration from a co-worker's knife at the JBS Souderton plant.

81.     On or about July 6, 2017, a JBS worker reported experiencing right hand and wrist pain from the use of dull knives while working at the JBS Souderton plant.

82.     On or about October 2, 2017, a JBS worker sustained a lower leg laceration during a knife slip incident while working at the JBS Souderton plant.

14

83.    On or about October 23, 2017, a JBS worker reported experiencing pain in the left shoulder, forearm, hand and digits due to the use of dull knives while working at the JBS Souderton plant.

84.    On or about November 27, 2017, a JBS worker reported experiencing right arm pain (hand, elbow and shoulder) due to repetitive use of dull knives while working at the JBS Souderton plant.

85.    On or about November 27, 2017, a JBS worker sustained a thumb laceration as a result of a falling knife while working at the JBS Souderton plant.

86.    On or about December 7, 2017, a JBS worker reported experiencing right elbow, wrist, hand and digit pain due to using short and dull knives while working at the JBS Souderton plant.

87.    On or about March 1, 2018, a JBS worker sustained a calf laceration as a result of a falling knife while working at the JBS Souderton plant.

88.    On or about April 19, 2018, a JBS worker reported experiencing right wrist and hand pain from needing to use extra force due to poor knives while working at the JBS Souderton plant.

89.    On or about June 22, 2018, during a JBS Souderton plant knife safety annual evaluation it was noted they "continue to find team members with dull knives."

90.    On or about July 11, 2018, a JBS worker sustained a right cheek laceration at the JBS Souderton plant.

91.    On or about December 17, 2018, a JBS worker sustained a laceration from a co-worker's knife at the JBS Souderton plant.

Case ID: 210201548

92.     On or about December 20, 2018, a JBS worker sustained a thumb/palm laceration as a result of dropping a knife while working at the JBS Souderton plant.

93.     On or about January 16, 2019, a JBS worker reported experiencing a work-related injury and or illness related to the worker's hands and digits as a result of gripping of a hook and dull knife while working at the JBS Souderton plant.

94.     On or about January 25, 2019, a JBS worker reported experiencing right arm pain from using dull knives while working at the JBS Souderton plant.

95.     On or about February 25, 2019, a JBS worker sustained a neck contusion while working at the JBS Souderton plant.

96.     On or about April 5, 2019, a JBS worker sustained a forearm laceration as a result of his knife slipping while working at the JBS Souderton plant.

97.     On or about April 24, 2019, a JBS worker sustained a laceration from a co-worker's knife at the JBS Souderton plant.

98.     On or about April 30, 2019, a JBS worker reported experiencing right wrist pain from the use of a dull knife over time while working at the JBS Souderton plant.

99.     On or about May 16, 2019, a JBS worker reported experiencing hand pain from using a dull knife while working at the JBS Souderton plant.

100.    The week prior to June 13, 2019, JBS Souderton plant employee Hancel Mendez informed JBS Souderton plant management of issues with his knife, but he was told to go back to work and continue using the same knife.

16

Case ID: 210201548

### *Dull Knives Are Dangerous and a Safety Hazard*

101.    A dull knife, in addition to being ineffective for correct incising or cutting, is a safety hazard.

102.    A dull knife requires the user to increase effort and exert more force.

103.    A dull knife requires the user to force the knife through meat.

104.    Workers with knives, particularly dull knives, risk permanent physical injuries to not only their own bodies but also the bodies of their coworkers which may result in death.

### *JBS Defendants' "Global Occupational Health & Specialist Teams"*

105.    On June 13, 2019 and before that date, the JBS Defendants had specialist teams working globally, including at the JBS Souderton plant, on Occupational Health & Safety.

106.    On June 13, 2019 and before that date, the JBS Defendants' Occupational Health & Safety global teams were responsible for mapping risks, assessing investment requirements and putting corrective action plans in place at their respective business divisions including the JBS Souderton plant.

107.    On June 13, 2019 and before that date, the JBS Defendants monitored safety indicators on a daily, weekly and monthly basis, prioritizing fast responses to health and safety issues including at the JBS Souderton plant.

108.    On June 13, 2019 and before that date, the JBS Defendants' health and safety targets were checked monthly at all units and business divisions including the JBS Souderton plant, reporting any changes in frequency and severity indicators and improvement initiatives.

17

109.     On June 13, 2019 and before that date, the JBS Defendants monitored accident action plans and any outstanding legal nonconformities raised during safety inspections including at the JBS Souderton plant.

### JBS Defendants' "Ergonomic Improvement Program"

110.     On June 13, 2019 and before that date, the JBS Defendants maintained the JBS USA Ergonomic Improvement Programs which was created to control or eliminate conditions or activities posing ergonomic risks in any particular location including the JBS Souderton plant.

111.     On June 13, 2019 and before that date, the JBS Defendants maintained week-long bimonthly corporate awareness campaigns at all plants and business divisions including the JBS Souderton plant.

112.     On June 13, 2019 and before that date the JBS Defendants designed, wrote, approved, provided and implemented the Ergonomic Improvement Program at the JBS Souderton plant.

### JBS Defendants' Company Ergonomics Program

113.     On June 13, 2019 and before that date, the JBS Defendants designed, wrote, approved, provided and required the Company Ergonomics Program at the JBS Souderton plant.

114.     On June 13, 2019 and before that date, the JBS Defendants' Corporate Safety Team reviewed the Company Ergonomics Program weekly, monthly and annually at the JBS Souderton Plant.

18

***JBS Defendants' "Safety Observation Process"***

115.    On June 13, 2019 and before that date, the JBS Defendants maintained the JBS

USA Safety Observation Process to ensure team members were able to accurately identify risks

and nonconformities in the workplace including at the JBS Souderton plant.

***JBS Defendants' - Knife Handling Safety Program***

116.    On June 13, 2019 and before that date, the JBS Defendants designed the Knife

Handling Safety Program at the JBS Souderton plant.

117.    On June 13, 2019 and before that date, the JBS Defendants wrote the Knife

Handling Safety Program at the JBS Souderton plant.

118.    On June 13, 2019 and before that date, the JBS Defendants approved the Knife

Handling Safety Program at the JBS Souderton plant.

119.    On June 13, 2019 and before that date, the JBS Defendants provided the Knife

Handling Safety Program at the JBS Souderton plant.

120.    On June 13, 2019 and before that date, the JBS Defendants approved and

required the Knife Handling Safety Program at the JBS Souderton plant.

121.    On June 13, 2019 and before that date, the JBS Defendants were responsible for

safety at all JBS locations worldwide including the JBS Souderton plant.

122.    On June 13, 2019 and before that date, the JBS Defendants' Corporate Safety

Team reviewed the Knife Handling Safety Program weekly at the JBS Souderton plant.

123.    On June 13, 2019 and before that date, the JBS Defendants' Corporate Safety

Team reviewed the Knife Handling Safety Program monthly at the JBS Souderton plant.

Case ID: 210201548

124.    On June 13, 2019 and before that date, the JBS Defendants' Corporate Safety

Team reviewed the Knife Handling Safety Program yearly at the JBS Souderton plant.

### *JBS Defendants' – Personal Protective Equipment Program*

125.    On June 13, 2019 and before that date, the JBS Defendants designed the

Personal Protection Equipment Program at the JBS Souderton plant.

126.    On June 13, 2019 and before that date, the JBS Defendants approved the

Personal Protection Equipment Program at the JBS Souderton plant.

127.    On June 13, 2019 and before that date, the JBS Defendants wrote the Personal

Protection Equipment Program at the JBS Souderton plant.

128.    On June 13, 2019 and before that date, the JBS Defendants provided the

Personal Protection Equipment Program at the JBS Souderton plant.

129.    On June 13, 2019 and before that date, the JBS Defendants approved and

required the Personal Protection Equipment Program at the JBS Souderton plant.

130.    On June 13, 2019 and before that date, the JBS Defendants' Corporate Safety

Team reviewed the Personal Protection Equipment Program weekly at the JBS Souderton plant.

131.    On June 13, 2019 and before that date, the JBS Defendants' Corporate Safety

Team reviewed the Personal Protection Equipment Program monthly at the JBS Souderton

plant.

132.    On June 13, 2019 and before that date, the JBS Defendants' Corporate Safety

Team reviewed the Personal Protection Equipment Program annually at the JBS Souderton

plant.

Case ID: 210201548

### *Inadequate Head, Neck and Chest Area*
### *Personal Protective Equipment at JBS Souderton Plant*

133.    On June 13, 2019 and before that date, the JBS Defendants' Personal Protective Equipment Program stated JBS Defendants' beef processing plants "shall provide at no cost to the employee any and all required personal protective equipment (PPE) determined to be necessary through the PPE hazard assessment..."

134.    On June 13, 2019 and before that date, the JBS Defendants' Knife Handling Safety Program stated, "In cases where the hazard cannot be corrected by engineering controls appropriate protective equipment has been issued to the employee."

135.    On June 13, 2019 and before that date, the JBS Defendants were required to ensure that their beef processing plant workers were issued appropriate personal protective equipment to protect them from projectiles.

136.    On June 13, 2019 and before that date, the JBS Defendants provided their meat cutters, head, neck and chest area protective equipment at other JBS meat processing facilities worldwide to protect them from serious bodily injury or death.

137.    On June 13, 2019 and before that date, the JBS Defendants failed to ensure JBS Souderton plant workers working as meat cutters were provided with appropriate head, neck and chest area protective equipment to protect them from serious bodily injury or death.

138.    On June 13, 2019 and before that date, the JBS Defendants failed to select, approve and require the appropriate PPE for their workers, including Mr. Htoo, to protect them from serious bodily injury or death.

21

Case ID: 210201548

139.   On June 13, 2019 and before that date, appropriate injury resistant head, neck and chest area personal protective equipment was not provided to Mr. Htoo.

**The Aramark Defendants' Unprotected Neck and Chest White Butcher Coats**

140.   The Aramark Defendants are engaged in the business of supplying employee uniforms and PPE to third-party businesses.

141.   On information and belief, The Aramark Defendants supplied Aramark Pocketless White Butcher Coats "GO1037" ("Butcher Coat" a/k/a "lab coat") to the JBS Defendants' beef processing facilities for the JBS Defendants' workers to wear at work.

142.   At the time of the incident, the Butcher Coat Mr. Htoo was wearing clearly stated it was the property of Aramark.

143.   The Aramark Butcher Coat's sole warning stated "not flame resistant."

144.   No warning related to the cut resistance of the Butcher Coat was provided to Mr. Htoo.

145.   On June 13, 2019 and before that date, Mr. Htoo worked as a meat cutter in the fabrication department at the JBS Defendants' JBS Souderton beef processing plant.

146.   On June 13, 2019 and before that date, Mr. Htoo wore an Aramark Butcher Coat selected, approved and required by the JBS Defendants.

147.   Mr. Htoo wore one of the Aramark Defendants' Butcher Coats while working at the JBS Souderton plant on June 13, 2019 at the time of the incident.

Case ID: 210201548

148.    A picture of an exemplar Aramark GO1037 Butcher Coat is shown below and

after paragraph 69 above:



### *The PIP Defendants' Unprotected Head, Chest and Neck*
### *One-Piece Long Sleeve Metal T-shirt*

149.    The PIP Defendants are manufacturers and distributors of personal protective

equipment for workers in the food processing industry.

150.    On June 13, 2019 and before that date, on information and belief Mr. Htoo wore

the PIP Defendants' One-Piece Long Sleeve Metal T-shirt (PPE) selected, approved and required

by the JBS Defendants.

Case ID: 210201548

151.    Pictures of the PIP Defendants' One-Piece Long Sleeve Metal T-shirt (PPE)

supplied to and worn by Mr. Htoo on the date and time of the incident are shown below:





Case ID: 210201548

***The PIP Defendants' Unprotected Head, Chest and Neck Stainless Steel Mesh Apron***

152.    On June 13, 2019 and before that date, on information and belief Mr. Htoo wore

the PIP Defendants' Stainless Steel Mesh Apron (PPE) selected, approved and required by the

JBS Defendants.

***The Honeywell Defendants' Unprotected Head, Chest and Neck
Metal Mesh T Shirt***

153.    The Honeywell Defendants are manufacturers and distributors of personal

protective equipment for workers in the food processing industry.

154.    On June 13, 2019 at the time of the incident and before that date, on

information and belief Mr. Htoo wore the Honeywell Defendants' Metal Mesh T Shirt (PPE)

selected, approved and required by the JBS Defendants.

25

155.    Pictures of the Honeywell Defendants' Metal Mesh T Shirt (PPE) supplied to Mr.

Htoo on the date of the incident are shown below:





Case ID: 210201548

### *The Honeywell Defendants' Unprotected Head, Chest and Neck Stainless Steel Mesh Body Protection Apron*

156.    On June 13, 2019 at the time of the incident and before that date, on information and belief Mr. Htoo wore the Honeywell Defendants' Stainless Steel Mesh Body Protection Apron (PPE) selected, approved and required by the JBS Defendants.

### *Human Head, Neck and Chest are High Risk Injury Locations*

157.    The human head, neck and chest are high risk injury locations.

158.    The human head, neck and chest contain vital parts of the human anatomy including arteries, veins, nerves, glands and the spinal cord some of which are just below the level of the skin.

159.    On June 13, 2019 and before that date, the Aramark Defendants' Butcher Coat worn by Mr. Htoo did not cover his neck or chest.

160.    On June 13, 2019 and before that date, the Aramark Defendants had a duty to assess the nature of the work conducted at the JBS Souderton plant to determine if hazards were present, or were likely to be present, which necessitated the use of personal protective equipment (PPE) and select PPE for JBS Souderton plant workers to use to protect them from the hazards identified.

161.    Work lab coats with neck and chest protection were commercially available before June 13, 2019.

162.    The PIP Defendants' One-Piece Long Sleeve Metal T-shirt did not cover Mr. Htoo's neck or chest.

27

163.    The PIP Defendants' Stainless Steel Mesh Apron did not cover Mr. Htoo's neck or chest.

164.    On June 13, 2019 and before that date, the PIP Defendants provided their One-Piece Long Sleeve Metal T-shirt to the JBS plant workers without pairing it with other head, neck and chest personal protection equipment.

165.    On June 13, 2019 and before that date, the PIP Defendants provided their Stainless Steel Mesh Apron to the JBS Souderton plant workers without pairing it with other head, neck and chest personal protection equipment.

166.    On June 13, 2019 and before that date, the PIP Defendants had a duty to assess the nature of work conducted at the JBS Souderton plant to determine if hazards were present, or were likely to be present, which necessitated the use of PPE and select PPE for JBS Souderton plant workers to use to protect them from the hazards identified.

167.    The Honeywell Defendants' Metal Mesh T Shirt did not cover Mr. Htoo's neck or chest.

168.    The Honeywell Defendants' Stainless Steel Mesh Body Protection Apron did not cover Mr. Htoo's neck or chest.

169.    On June 13, 2019 and before that date, the Honeywell Defendants provided their Metal Mesh T Shirt to the JBS Souderton plant workers without pairing it with other head, neck and chest personal protection equipment.

28

170.    On June 13, 2019 and before that date, the Honeywell Defendants provided their Stainless Steel Mesh Body Protection Apron to the JBS plant workers without pairing it with other head, neck and chest personal protection equipment.

171.    On June 13, 2019 and before that date, the Honeywell Defendants had a duty to assess the nature of work conducted at the JBS Souderton plant to determine if hazards were present, or were likely to be present, which necessitated the use of PPE and select PPE for JBS Souderton plant workers to use to protect them from the hazards identified.

172.    The JBS Defendants did not select, approve and require appropriate personal protection equipment to protect Mr. Htoo's head, neck and chest on June 13, 2019.

173.    Personal protection equipment with head, neck and chest protection was commercially available and sold by PIP Defendants before June 13, 2019.

### Face Shields, Balaclavas Found at Other JBS Processing Plants not Provided to Meat Cutters at JBS Souderton Plant

174.    The JBS Defendants did not select, approve and require appropriate face shield with head, neck and chest protection for Mr. Htoo to wear on June 13, 2019.

175.    Face shields with head, neck and chest protection were commercially available before June 13, 2019.

176.    Face shields that provide head, neck and chest protection were part of standard personal protective equipment at other JBS meat processing plants worldwide before June 13, 2019.

29

177.   Balaclavas that provide head, neck and chest protection were part of the

standard issued personal protective equipment at other JBS meat processing plants worldwide

before June 13, 2019 as indicated in the photographs below:



30

Case ID: 210201548

178.   Cut resistant balaclavas that provided head, neck and chest protection were commercially available before June 13, 2019.

179.   The JBS Defendants did not select, approve and require an appropriate balaclava with head, neck and chest protection for Mr. Htoo to wear on June 13, 2019.

### The Death of Bosco Htoo

180.   On June 13, 2019, between approximately 6:00 A.M. and 6:29 A.M., JBS Souderton, Inc. plant employees Hancel Mendez ("Mendez") and Bosco Htoo reported to work as meat cutters inside the JBS Souderton, Inc.'s plant.

181.   On June 13, 2019 and before that date, Mr. Mendez and Mr. Htoo were listed on JBS Souderton, Inc.'s payroll and working under the immediate supervision of JBS Souderton, Inc.'s management.

182.   On June 13, 2019 and before that date, JBS Souderton, Inc. plant employees Mr. Mendez and Mr. Htoo were using JBS Souderton, Inc.'s tools and wearing JBS Souderton, Inc.'s equipment while furthering JBS Souderton, Inc.'s business processing meat products.

183.   On June 13, 2019, between approximately 6:00 A.M. and 6:29 A.M., JBS Souderton plant worker Mendez advised his JBS Souderton plant supervisor that his meat cutting knife was dull as he attempted to make his first cut of the day through a piece of meat.

184.   On June 13, 2019, between approximately 6:00 A.M. and 6:29 A.M., Mendez's JBS Souderton plant supervisor told Mendez to just keep working and he would handle the issue later.

31

185.    On June 13, 2019 between approximately 6:00 A.M. and 6:29 A.M., Mendez advised his JBS Souderton plant supervisor a second time that his knife was dull and not working properly.

186.    On June 13, 2019 between approximately 6:00 A.M. and 6:29 A.M., Mendez continued to work but his knife was not cutting properly requiring Mendez to use greater force.

187.    On June 13, 2019 at approximately 6:30 A.M Mendez's knife slipped out of his hand while breaking through a section of beef resulting in his knife hitting the adjacent cutting table, and then bouncing across a conveyor belt, with the blade of the knife striking coworker Mr. Htoo in the neck.

188.    On June 13, 2019 at approximately 6:30 A.M another JBS Souderton plant employee standing near Mr. Htoo at the time of the incident was struck in the chest with the same knife but suffered only minor injuries.

189.    A JBS supervisor at the JBS Souderton plant and coworkers took Mr. Htoo to an office to try to stop Mr. Htoo's neck from bleeding.

190.    On June 13, 2019 at approximately 6:37 A.M., a JBS Souderton plant nurse was the first to provide medical attention to Mr. Htoo in an office area located below the beef fabrication floor.

191.    On June 13, 2019, Souderton Community Ambulance arrived at the JBS Souderton plant at approximately 6:46 A.M. and were confronted with a chaotic scene of approximately 100 or more people yelling, screaming and moving in multiple locations.

192.    The ambulance crew was guided through a cafeteria, down a hallway and into a room where a JBS Souderton plant nurse was attending to Mr. Htoo.

32

Case ID: 210201548

193.    The ambulance crew's access to Mr. Htoo during this emergency situation was delayed because of JBS Souderton plant workers congregating in the hallways, cafeteria, breakroom and office.

194.    The ambulance crew's attempt to move the crowd of JBS Souderton plant workers who gathered around Mr. Htoo was difficult and required assistance from responding police officers.

195.    The ambulance crew moved Mr. Htoo to an awaiting ambulance due to the large screaming crowd of JBS Souderton plant workers.

196.    The ambulance crew's ability to care for Mr. Htoo was negatively impacted by a lack of a translator to allow communication on scene with individuals who did not speak English.

197.    At that time Mr. Htoo was flailing his arms and moaning.

198.    Mr. Htoo died from his painful injuries on June 13, 2019 at 7:31 A.M.

199.    An autopsy report confirmed that Mr. Htoo died as a result of an incised knife wound at the base of his neck.

200.    Mr. Htoo sustained conscious pain and suffering, and fear of impending death.

201.    Mr. Htoo sustained a permanent loss of earnings and loss of earning capacity.

202.    Mr. Htoo sustained permanent loss of enjoyment of life, loss of life's pleasures, and loss of life's hedonic pleasures.

203.    Mr. Htoo has been permanently prevented from performing all his usual duties, occupations, recreational activities, and avocations, all to his and his beneficiaries' loss and detriment.

Case ID: 210201548

204.    Mr. Htoo's death was the predictable and preventable result of the JBS Defendants' negligence, gross negligence, failures to consider the safety of their workers, the Aramark Defendants' defective Butcher Coat and negligence, the PIP Defendants' defective One-Piece Long Sleeve Metal T-shirt and Stainless Steel Mesh Apron and negligence, and the Honeywell Defendants' defective Metal Mesh T Shirt and Stainless Steel Mesh Body Protection Apron and negligence.

205.    As a direct result of the carelessness, negligence, recklessness, gross negligence, and/or other liability producing conduct of the Aramark Defendants, PIP Defendants, Honeywell Defendants and JBS Defendants, Plaintiff's decedent, Bosco Htoo, suffered injuries that led to his death.

206.    The outrageous conduct described herein warrants the imposition of punitive damages to deter the Aramark Defendants, PIP Defendants, Honeywell Defendants and JBS Defendants and meat processing plants that operate in Pennsylvania and across the country from placing profits over the safety of their workers, their workers' families, and the public at large.

207.    The damages sought by Plaintiff are in excess of $50,000.00.

### COUNT I - STRICT PRODUCTS LIABILITY

### PLAINTIFF V. ARAMARK UNIFORM & CAREER APPAREL, LLC, ARAMARK UNIFORM & APPAREL GROUP, INC. AND ARAMARK A/K/A ARAMARK CORPORATION

208.    The paragraphs and allegations stated above are incorporated herein by reference as if the same were set forth fully herein.

34

Case ID: 210201548

209. Upon information and belief, the Aramark Defendants supplied some or all of the JBS Defendants' workers at the JBS Souderton plant with Aramark GO1037 Butcher Coats.

210. Aramark Butcher Coats are composed of 100% polyester.

211. At the time of the incident, the Aramark GO1037 Butcher Coats provided to the JBS Defendants' beef processing plant workers (including Mr. Htoo) were owned by the Aramark Defendants.

212. The Aramark Defendants actively marketed and sold the type of butcher coats that Mr. Htoo was wearing at the time of the incident as designed specifically for the food industry.

213. The Aramark Defendants, either directly or through a third party, marketed, rented, sold, or provided the Butcher Coat that Mr. Htoo was wearing at the time of the incident to the JBS Souderton plant workers to wear.

214. The Aramark Defendants knew or should have known that the type of Butcher Coats that were provided to the beef processing plant workers at the JBS Defendants' beef processing plant were not fit for the intended use—to be worn inside a beef processing plant where knife injury hazards are known.

215. The Aramark Defendants knew or should have known that the Butcher Coat they provided to Mr. Htoo to wear at the JBS Defendants' beef processing plant was dangerous for the use for which it was supplied.

216. The Aramark Defendants should not have supplied the unprotected open neck and chest butcher coat or allowed the unprotected open neck and chest butcher coat to be supplied to a beef processing plant where there is a high risk of knife injury hazards.

Case ID: 210201548

217. The Aramark Defendants knew or should have known that their Butcher Coats leave the neck and chest area of the intended user's skin unprotected in case of exposure to injuries, such as from a knife.

218. Despite knowing that the Butcher Coats (including the Butcher Coat worn by Mr. Htoo on the date of the incident) were defectively designed for use in a beef processing plant, the Aramark Defendants nevertheless provided their Butcher Coats knowing that the Butcher Coats would be used in a beef processing plant.

219. As a worker at the JBS Souderton plant Mr. Htoo was an intended and reasonably foreseeable user of the Aramark Butcher Coats.

220. Mr. Htoo used the Aramark Butcher Coats in an intended and reasonably foreseeable manner.

221. The Aramark Defendants designed, configured, manufactured, marketed, produced, rented, sold, supplied, transported, delivered, distributed, cleaned, laundered, maintained and otherwise placed their Butcher Coat in the market for sale and rental.

222. By placing their Butcher Coat into the stream of commerce, the Aramark Defendants represented that it could be safely used as a butcher coat in the food industry.

223. The Butcher Coat did not undergo any change in condition as supplied by the Aramark Defendants.

224. However, the Aramark Butcher Coat was unsafe for its intended use that existed prior to such time as the Butcher Coat was received by Mr. Htoo.

225. Specifically, the Butcher Coat was defectively designed because it was provided for use in an environment where injuries from knives were a known hazard. The Butcher Coat

36

should have been made with neck and chest protection and not an open collar and open chest design.

226.    Additionally, the Butcher Coat was defective because the warning label inside the work coat was inadequate and the Aramark Defendants otherwise failed to warn ultimate users regarding the dangers of wearing the Butcher Coat in an environment where injuries from knives are a known hazard. The warning should have stated clear warnings that the Butcher Coat could cause serious injury or death if worn in an environment where knife injuries were a known hazard.

227.    Prior to June 13, 2019 there were protective work lab coats in the marketplace that provided neck and chest protection.

228.    Mr. Htoo was unaware of the defective nature of the Butcher Coat (both the design defect and warning defect) and was otherwise unaware of the Butcher Coat's unreasonably dangerous and/or unsafe condition.

229.    At the time of the incident, the Butcher Coat failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner because of the defects described herein.

230.    The Aramark Butcher Coat defects (both in design and lack of adequate warnings) were a proximate cause of Mr. Htoo's injuries, which ultimately led to his death.

WHEREFORE, Plaintiff demands judgment in her favor for all compensatory damages, including, but not limited to, compensation for pain and suffering, compensation for limitation and preclusion from performing normal activities, compensation for loss of health,

Case ID: 210201548

compensation for medical expenses, and any further relief to which the Plaintiff is justly

entitled at law or in equity.

## COUNT II – NEGLIGENCE

### PLAINTIFF V. ARAMARK UNIFORM & CAREER APPAREL, LLC, ARAMARK UNIFORM & APPAREL GROUP, INC. AND ARAMARK A/K/A ARAMARK CORPORATION

231.  The paragraphs and allegations stated above are incorporated herein by

reference as if the same were set forth fully herein.

232.  The Aramark Defendants provided and marketed their Butcher Coats specifically

for use by beef processing plant workers as their protective work coats at the JBS Souderton

plant.

233.  The sole warning inside these Butcher Coats states "not flame resistant."

234.  The Aramark Defendants' negligence in providing Butcher Coats to beef

processing plant workers proximately caused Mr. Htoo's injuries.

235.  The Aramark Defendants owed a duty to Mr. Htoo to provide safe butcher coats

for beef processing plant workers and/or to adequately warn the workers of the dangers of

their work coats. The Aramark Defendants breached that duty and their negligence includes,

but is not limited to, the following:

> a.  Marketing an open unprotected neck and chest protective work coat to a
>     beef processing facility company where knife injuries are common;
>
> b.  Failing to suggest alternate protective work coats made with neck and
>     chest area protection that were available in the market place;

38

c.    Failing to provide a safe protective work coat for Mr. Htoo's work environment;

d.    Failing to attach adequate warnings to the protective work coat;

e.    Failing to include adequate warnings in the advertisement of the protective work coat to warn of its lack of neck and chest area protection;

f.    Failing to adequately warn Mr. Htoo of the dangers of the protective work coat;

g.    Failing to adequately supervise their employees;

h.    Failing to provide adequate training to their employees;

i.    Failing to comply with applicable rules and regulations;

j.    Failing to train users how to properly wear the protective work coat;

k.    Failing to provide the proper size protective work coat;

l.    Failing to train workers on how to properly size the protective work coat;

m.    Failing to provide protective work coats with neck and chest protection;

n.    Other acts deemed negligent and grossly negligent.

236.    These breaches were a proximate cause of Mr. Htoo's severe injuries, which resulted in physical pain, mental anguish, physical impairment, disfigurement, distress, and eventually his death.

WHEREFORE, Plaintiff demands judgment in her favor on behalf of the Estate of Bosco Htoo for all compensatory damages, including, but not limited to, compensation for pain and suffering, compensation for limitation and preclusion from performing normal activities,

Case ID: 210201548

compensation for loss of health, compensation for medical expenses, and any further relief to

which the Plaintiff is justly entitled at law or in equity.

### COUNT III - STRICT PRODUCTS LIABILITY

### PLAINTIFF V. PROTECTIVE INDUSTRIAL PRODUCTS, INC., PIP USA MANUFACTURING, INC., WORLDWIDE PROTECTIVE PRODUCTS, LLC, US MESH, INC. A/K/A XUSM, INC., AND PROCESSING SOLUTIONS, LLC

237.    The paragraphs and allegations stated above are incorporated herein by

reference as if the same were set forth fully herein.

238.    On June 13, 2019 and before that date, the PIP Defendants supplied some or all

of the workers at the JBS Souderton plant with PIP Defendants' One-Piece Long Sleeve Metal T-

shirts ("One-Piece Long Sleeve Metal T-shirts").

239.    The PIP Defendants' One-Piece Long Sleeve Metal T-shirts are composed of steel

with fabric closures.

240.    The PIP Defendants' One-Piece Long Sleeve Metal T-shirts are composed of steel

with fabric closures and were designed to provide cut resistance and provide protection against

stabs and punctures.

241.    At the time of the incident, the PIP Defendants' One-Piece Long Sleeve Metal T-

shirts provided to the JBS Defendants' beef processing plant workers (including Mr. Htoo) were

sold by the PIP Defendants.

242.    The PIP Defendants actively marketed and sold the type of One-Piece Long

Sleeve Metal T-shirt that Mr. Htoo was wearing at the time of the incident.

243.    The PIP Defendants, either directly or through a third party, marketed, sold, or provided the One-Piece Long Sleeve Metal T-shirt, that Mr. Htoo was wearing at the time of the incident, to the JBS Souderton plant workers to wear.

244.    The PIP Defendants knew or should have known that the One-Piece Long Sleeve Metal T-shirts that were provided to the workers at the JBS Defendants' beef processing plants were not fit for the intended use—to be worn independent of other head, neck and chest personal protective equipment inside a beef processing plant where a high risk of knife injury hazards is known.

245.    The PIP Defendants' One-Piece Long Sleeve Metal T-shirt that was worn by Mr. Htoo on the date and time of the incident is shown in the photograph below and after paragraph number 151 above:



41

Case ID: 210201548

246.    The PIP Defendants knew or should have known that the One-Piece Long Sleeve
Metal T-shirt they provided to Mr. Htoo to wear at the JBS Defendants' beef processing plant
was dangerous for the use for which it was supplied.

247.    The PIP Defendants should not have supplied the One-Piece Long Sleeve Metal T-
shirt or allowed the One-Piece Long Sleeve Metal T-shirt to be supplied to a beef processing
plant without pairing it with other personal protective equipment that provides head, neck and
chest protection where there is a high risk of knife injuries and hazards.

248.    The PIP Defendants knew or should have known that their One-Piece Long
Sleeve Metal T-shirt would leave the head, neck and chest area of the intended user's skin
unprotected in case of exposure to knife injuries in a meat processing plant.

249.    Despite knowing that their One-Piece Long Sleeve Metal T-shirts (including the
One-Piece Long Sleeve Metal T-shirt worn by Mr. Htoo on the date of the incident) were
defectively designed for use in a beef processing plant independent of other personal
protective equipment, the PIP Defendants nevertheless provided the One-Piece Long Sleeve
Metal T-shirts knowing that the One-Piece Long Sleeve Metal T-shirts would be used
independent of other personal protective equipment in a beef processing plant.

250.    As a worker at the JBS Souderton beef processing plant, Mr. Htoo was an
intended and reasonably foreseeable user of the PIP Defendants' One-Piece Long Sleeve Metal
T-shirt.

251.    Mr. Htoo used the PIP Defendants' One-Piece Long Sleeve Metal T-shirt in an
intended and reasonably foreseeable manner.

42

Case ID: 210201548

252.    The PIP Defendants designed, configured, manufactured, marketed, produced, sold, supplied, transported, delivered, distributed, and otherwise placed the One-Piece Long Sleeve Metal T-shirt in the market for sale.

253.    By placing the One-Piece Long Sleeve Metal T-shirt into the stream of commerce, the PIP Defendants represented that it could be safely used as personal protective equipment in the food processing industry.

254.    The One-Piece Long Sleeve Metal T-shirt did not undergo any change in condition as supplied by PIP Defendants.

255.    However, the One-Piece Long Sleeve Metal T-shirt was unsafe for its intended use that existed prior to such time as the personal protective equipment was received by Mr. Htoo.

256.    Specifically, the One-Piece Long Sleeve Metal T-shirt was defectively designed because it was provided for use in an environment where knife injuries are a known hazard. The One-Piece Long Sleeve Metal T-shirt should have been paired with other personal protection equipment to cover the head, neck and chest areas of the user.

257.    Additionally, the One-Piece Long Sleeve Metal T-shirt was defective because the warning label inside the One-Piece Long Sleeve Metal T-shirt failed to provide any warnings and the PIP Defendants otherwise failed to warn the ultimate users regarding the dangers of wearing the One-Piece Long Sleeve Metal T-shirt independent of other head, neck and chest personal protective equipment in an environment where there is a risk of knife injuries. The warning should have stated clear warnings that the One-Piece Long Sleeve Metal T-shirt could

43

cause serious injury or death if worn independent of and not paired with other personal protective equipment in an environment where knife injuries were a known hazard.

258. Mr. Htoo was unaware of the defective nature of the One-Piece Long Sleeve Metal T-shirt (both the design defect and warning defect) and was otherwise unaware of the One-Piece Long Sleeve Metal T-shirt's unreasonably dangerous and/or unsafe condition.

259. At the time of the incident, the One-Piece Long Sleeve Metal T-shirt failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner because of the defects described herein.

260. At the time of the incident there were Kevlar head, neck and chest PPE in the marketplace that provided head, neck and chest protection from potential knife injuries.

261. At the time of the incident, the PIP Defendants designed, manufactured, marketed and sold head, neck and chest personal protection equipment that provided head, neck and chest protection from potential knife injuries.

262. The PIP Defendants' One-Piece Long Sleeve Metal T-shirts' defects (both in design and lack of adequate warnings) were a proximate cause of Mr. Htoo's injuries, which ultimately led to his death.

WHEREFORE, Plaintiff demands judgment in her favor for all compensatory damages, including, but not limited to, compensation for pain and suffering, compensation for limitation and preclusion from performing normal activities, compensation for loss of health, compensation for medical expenses, and any further relief to which the Plaintiff is justly entitled at law or in equity.

Case ID: 210201548

## COUNT IV – NEGLIGENCE

### PLAINTIFF V. PROTECTIVE INDUSTRIAL PRODUCTS, INC., PIP USA MANUFACTURING, INC., WORLDWIDE PROTECTIVE PRODUCTS, LLC, US MESH, INC. A/K/A XUSM, INC., AND PROCESSING SOLUTIONS, LLC

263.   The paragraphs and allegations stated above are incorporated herein by reference as if the same were set forth fully herein.

264.   The PIP Defendants provided their One-Piece Long Sleeve Metal T-shirts specifically for use by beef processing plant workers as their work personal protective equipment.

265.   There were no warnings inside these PIP One-Piece Long Sleeve Metal T-shirts.

266.   The PIP Defendants' negligence in providing One-Piece Long Sleeve Metal T-shirts to beef processing plant workers without pairing them with other personal protective equipment proximately caused Mr. Htoo's injuries.

267.   The PIP Defendants owed a duty to Mr. Htoo to provide a safe one-piece long sleeve metal T-shirt for a beef processing plant worker and/or to adequately warn Mr. Htoo of the dangers of the One-Piece Long Sleeve Metal T-shirt. The PIP Defendants breached that duty and their negligence includes, but is not limited to, the following:

> a.   Marketing an open unprotected head, neck and chest One-Piece Long Sleeve Metal T-shirt to a beef processing plant company;
>
> b.   Failing to suggest alternate and additional personal protective equipment made with head, neck and chest area protection;
>
> c.   Failing to pair the One-Piece Long Sleeve Metal T-shirt with other personal protective equipment with head, neck and chest protection;

45

d.   Failing to provide a safe one-piece long sleeve metal T-shirt personal protective equipment for Mr. Htoo's work environment;

e.   Failing to attach adequate warnings to the One-Piece Long Sleeve Metal T-shirt personal protective equipment;

f.   Failing to include adequate warnings in the advertisement of the One-Piece Long Sleeve Metal T-shirt personal protective equipment to warn of its lack of head, neck and chest area protection and to pair it with other PPE to protect the head, neck and chest;

g.   Failing to adequately warn Plaintiff of the dangers of the One-Piece Long Sleeve Metal T-shirt personal protective equipment;

h.   Failing to adequately supervise their employees;

i.   Failing to provide adequate training to their employees;

j.   Failing to train users how to properly wear One-Piece Long Sleeve Metal T-shirt personal protective equipment;

k.   Failing to provide the proper size One-Piece Long Sleeve Metal T-shirt personal protective equipment;

l.   Failing to provide head, neck and chest protection;

m.   Failing to comply with applicable rules and regulations;

n.   Other acts deemed negligent and grossly negligent.

268.   These breaches were a proximate cause of Mr. Htoo's severe injuries, which resulted in physical pain, mental anguish, physical impairment, disfigurement, distress, and eventually his death.

Case ID: 210201548

WHEREFORE, Plaintiff demands judgment in her favor on behalf of the Estate of Bosco

Htoo for all compensatory damages, including, but not limited to, compensation for pain and

suffering, compensation for limitation and preclusion from performing normal activities,

compensation for loss of health, compensation for medical expenses, and any further relief to

which the Plaintiff is justly entitled at law or in equity.

### COUNT V - STRICT PRODUCTS LIABILITY

**PLAINTIFF V. PROTECTIVE INDUSTRIAL PRODUCTS, INC.,
PIP USA MANUFACTURING, INC., WORLDWIDE PROTECTIVE PRODUCTS, LLC,
US MESH INC. A/K/A XUSM, INC., AND PROCESSING SOLUTIONS, LLC**

269.    The paragraphs and allegations stated above are incorporated herein by

reference as if the same were set forth fully herein.

270.    The PIP Defendants supplied some or all of the JBS Souderton plant workers with

PIP Defendants' Stainless Steel Mesh Aprons (Stainless Steel Mesh Aprons").

271.    The PIP Defendants' Stainless Steel Mesh Aprons are composed of steel with

fabric straps.

272.    At the time of the incident, the PIP Defendants' Stainless Steel Mesh Aprons

provided to the workers at the JBS Souderton's beef processing plant (including Mr. Htoo) were

owned by the JBS Defendants.

273.    The PIP Defendants actively marketed and sold the type of Stainless Steel Mesh

Apron that Mr. Htoo was wearing at the time of the incident.

274.    The PIP Defendants, either directly or through a third party, marketed, sold, or

provided the Stainless Steel Mesh Apron, that Mr. Htoo was wearing at the time of the incident,

to the workers at the JBS Souderton plant to wear.

47

Case ID: 210201548

275.    The PIP Defendants knew or should have known that the Stainless Steel Mesh Aprons that were provided to the workers at the JBS Souderton beef processing plant were not fit for the intended use—to be worn independent of other head, neck and chest personal protective equipment inside a beef processing plant where a high risk of knife injury hazards were known.

276.    The PIP Defendants knew or should have known that the Stainless Steel Mesh Apron they provided to Mr. Htoo to wear at the JBS Souderton's beef processing plant was dangerous for the use for which it was supplied.

277.    The PIP Defendants should not have supplied the Stainless Steel Mesh Apron or allowed the Stainless Steel Mesh Apron to be supplied to a beef processing plant without pairing it with other personal protective equipment that provides head, neck and chest protection where there is a high risk of knife injuries and hazards.

278.    The PIP Defendants knew or should have known that the Stainless Steel Mesh Aprons would leave the head, neck and chest area of the intended user's skin unprotected in case of exposure to injuries from a knife in a meat processing plant.

279.    Despite knowing that the Stainless Steel Mesh Aprons (including the Stainless Steel Mesh Apron worn by Mr. Htoo on the date and time of the incident) were defectively designed for use in a beef processing plant independent of other personal protective equipment, the PIP Defendants nevertheless provided the Stainless Steel Mesh Aprons knowing that the Stainless Steel Mesh Aprons would be used independent of other personal protective equipment in a beef processing plant.

48

Case ID: 210201548

280.    As a worker at the JBS Souderton beef processing plant, Mr. Htoo was an
intended and reasonably foreseeable user of the PIP Defendants' Stainless Steel Mesh Apron.

281.    Mr. Htoo used the PIP Defendants' Stainless Steel Mesh Apron in an intended
and reasonably foreseeable manner.

282.    The PIP Defendants designed, configured, manufactured, marketed, produced,
sold, supplied, transported, delivered, distributed, and otherwise placed the Stainless Steel
Mesh Apron in the market for sale.

283.    By placing the Stainless Steel Mesh Apron into the stream of commerce, the PIP
Defendants represented that it could be safely used as personal protective equipment in the
food processing industry.

284.    The Stainless Steel Mesh Apron did not undergo any change in condition as
supplied by PIP Defendants.

285.    However, the Stainless Steel Mesh Apron was unsafe for its intended use that
existed prior to such time as the personal protective equipment was received by Mr. Htoo.

286.    Specifically, the Stainless Steel Mesh Apron was defectively designed because it
was provided for use in an environment where knife injuries are a known hazard. The Stainless
Steel Mesh Apron should have been paired with personal protection equipment to cover the
head, neck and chest areas of the user.

287.    Additionally, the Stainless Steel Mesh Apron was defective because the warning
label inside the Stainless Steel Mesh Apron failed to provide any warnings and the PIP
Defendants otherwise failed to warn the ultimate users regarding the dangers of wearing the
Stainless Steel Mesh Apron independently and not paired with other head, neck and chest

Case ID: 210201548

personal protective equipment in an environment where there is a risk of knife injuries. The warning should have stated clear warnings that the Stainless Steel Mesh Apron could cause serious injury or death if worn independent of other personal protective equipment in an environment where knife injuries were a known hazard.

288.    Mr. Htoo was unaware of the defective nature of the Stainless Steel Mesh Apron (both the design defect and warning defect) and was otherwise unaware of the Stainless Steel Mesh Apron's unreasonably dangerous and/or unsafe condition.

289.    At the time of the incident, the Stainless Steel Mesh Apron failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner because of the defects described herein.

290.    At the time of the incident there were Kevlar head, neck and chest PPE in the marketplace that provided head, neck and chest protection.

291.    At the time of the incident, the PIP Defendants designed, manufactured, marketed and sold head, neck and chest PPE.

292.    The PIP Defendants' Stainless Steel Mesh Aprons defects (both in design and lack of adequate warnings) were a proximate cause of Mr. Htoo's injuries, which ultimately led to his death.

WHEREFORE, Plaintiff demands judgment in her favor for all compensatory damages, including, but not limited to, compensation for pain and suffering, compensation for limitation and preclusion from performing normal activities, compensation for loss of health, compensation for medical expenses, and any further relief to which the Plaintiff is justly entitled at law or in equity.

50

Case ID: 210201548

**COUNT VI – NEGLIGENCE**

**PLAINTIFF V. PROTECTIVE INDUSTRIAL PRODUCTS, INC.,
PIP USA MANUFACTURING, INC., WORLDWIDE PROTECTIVE PRODUCTS, LLC,
US MESH. INC. A/K/A XUSM, INC., AND PROCESSING SOLUTIONS, LLC**

293.    The paragraphs and allegations stated above are incorporated herein by

reference as if the same were set forth fully herein.

294.    The PIP Defendants provided their Stainless Steel Mesh Aprons specifically for

use by beef processing plant workers as their work personal protective equipment.

295.    The were no warnings inside these PIP Defendants' Stainless Steel Mesh Aprons.

296.    The PIP Defendants' negligence in providing Stainless Steel Mesh Aprons to beef

processing plant workers without pairing them with other personal protective equipment

proximately caused Mr. Htoo's injuries.

297.    The PIP Defendants owed a duty to Mr. Htoo to provide a safe stainless steel

mesh apron for a beef processing plant worker and/or to adequately warn Mr. Htoo of the

dangers of the Stainless Steel Mesh Apron. The PIP Defendants breached that duty and their

negligence includes, but is not limited to, the following:

    a.    Marketing an open unprotected head, neck and chest Stainless Steel

        Mesh Apron to a beef processing plant company;

    b.    Failing to suggest alternate and additional personal protective equipment

        made with head, neck and chest area protection;

    c.    Failing to pair the Stainless Steel Mesh Apron with other personal

        protective equipment with head, neck and chest protection;

d.    Failing to provide a safe stainless steel mesh apron personal protective equipment for Mr. Htoo's work environment;

e.    Failing to attach adequate warnings to the Stainless Steel Mesh Apron personal protective equipment;

f.    Failing to include adequate warnings in the advertisement of the Stainless Steel Mesh Apron personal protective equipment to warn of its lack of head, neck and chest area protection;

g.    Failing to adequately warn Plaintiff of the dangers of the Stainless Steel Mesh Apron personal protective equipment;

h.    Failing to adequately supervise their employees;

i.    Failing to provide adequate training to their employees;

j.    Failing to train users how to properly wear Stainless Steel Mesh Apron personal protective equipment;

k.    Failing to provide the proper size Stainless Steel Mesh Apron personal protective equipment;

l.    Failing to provide head, neck and chest protection;

m.    Failing to comply with applicable rules and regulations;

n.    Other acts deemed negligent and grossly negligent.

298.    These breaches were a proximate cause of Mr. Htoo's severe injuries, which resulted in physical pain, mental anguish, physical impairment, disfigurement, distress, and eventually his death.

52

Case ID: 210201548

WHEREFORE, Plaintiff demands judgment in her favor on behalf of the Estate of Bosco

Htoo for all compensatory damages, including, but not limited to, compensation for pain and

suffering, compensation for limitation and preclusion from performing normal activities,

compensation for loss of health, compensation for medical expenses, and any further relief to

which the Plaintiff is justly entitled at law or in equity.

## COUNT VII - STRICT PRODUCTS LIABILITY

### PLAINTIFF V. HONEYWELL INTERNATIONAL, INC. AND HONEYWELL SAFETY PRODUCTS USA, INC.

299.    The paragraphs and allegations stated above are incorporated herein by

reference as if the same were set forth fully herein.

300.    On June 13, 2019 and before that date, the Honeywell Defendants supplied

some or all of the workers at the JBS Souderton plant with Honeywell Defendants' Metal Mesh

T Shirts ("Metal Mesh T Shirts") PPE.

301.    The Honeywell Defendants' Metal Mesh T Shirts are composed of steel with

fabric closures.

302.    The Honeywell Defendants' Metal Mesh T Shirts are composed of steel with

fabric closures and were designed to provide cut resistance and provide protection against cuts

and slashes.

303.    At the time of the incident, the Honeywell Defendants' Metal Mesh T Shirts

provided to the JBS Souderton's beef processing plant workers (including Mr. Htoo) were sold

by the Honeywell Defendants.

304.    The Honeywell Defendants actively marketed and sold the type of Metal Mesh T

Shirt that Mr. Htoo was wearing at the time of the incident.

Case ID: 210201548

305.    The Honeywell Defendants, either directly or through a third party, marketed, sold, or provided the Metal Mesh T Shirt that Mr. Htoo was wearing at the time of the incident, to the JBS Souderton workers to wear.

306.    The Honeywell Defendants knew or should have known that the Metal Mesh T Shirts that were provided to the workers at the JBS Souderton's beef processing plant were not fit for the intended use—to be worn independent of other head, neck and chest personal protective equipment inside a beef processing plant where a high risk of knife injury hazards is known.

307.    The Honeywell Defendants' Metal Mesh T Shirt that was worn by Mr. Htoo on the date and time of the incident is shown in the photograph below and after paragraph number 155 above:



Case ID: 210201548

308.    The Honeywell Defendants knew or should have known that the Metal Mesh T Shirt they provided to Mr. Htoo to wear at the JBS Souderton's beef processing plant was dangerous for the use for which it was supplied.

309.    The Honeywell Defendants should not have supplied the Metal Mesh T Shirt or allowed the Metal T-shirt to be supplied to a beef processing plant without pairing it with other personal protective equipment that provides head, neck and chest protection where there is a high risk of knife injuries and hazards.

310.    The Honeywell Defendants knew or should have known that their Metal Mesh T Shirts  would leave the head, neck and chest area of the intended user's skin unprotected in case of exposure to knife injuries in a meat processing plant.

311.    Despite knowing that their Metal Mesh T Shirts (including the Metal Mesh T Shirt worn by Mr. Htoo on the date and time of the incident) were defectively designed for use in a beef processing plant independent of other personal protective equipment, the Honeywell Defendants nevertheless provided the Metal Mesh T Shirts knowing that the Metal Mesh T Shirts would be used independent of other personal protective equipment in a beef processing plant.

312.    As a worker at the JBS Souderton beef processing plant, Mr. Htoo was an intended and reasonably foreseeable user of the Honeywell Defendants' Metal Mesh T Shirts.

313.    Mr. Htoo used the Honeywell Defendants' Metal Mesh T Shirts in an intended and reasonably foreseeable manner.

Case ID: 210201548

314.    The Honeywell Defendants designed, configured, manufactured, marketed, produced, sold, supplied, transported, delivered, distributed, and otherwise placed the Metal Mesh T Shirts in the market for sale.

315.    By placing the Metal Mesh T Shirts into the stream of commerce, the Honeywell Defendants represented that they could be safely used as personal protective equipment in the food processing industry.

316.    The Metal Mesh T Shirt did not undergo any change in condition as supplied by Honeywell Defendants.

317.    However, the Metal Mesh T Shirt was unsafe for its intended use that existed prior to such time as the personal protective equipment was received by Mr. Htoo.

318.    Specifically, the Metal Mesh T Shirt was defectively designed because it was provided for use in an environment where knife injuries are a known hazard. The Metal Mesh T Shirts should have been paired with other personal protection equipment to cover the head, neck and chest areas of the user.

319.    Additionally, the Metal Mesh T Shirt was defective because the warning label inside the Metal Mesh T Shirt failed to provide any warnings and the Honeywell Defendants otherwise failed to warn the ultimate users regarding the dangers of wearing the Metal Mesh T Shirt independent of other head, neck and chest personal protective equipment in an environment where there is a risk of knife injuries. The warning should have stated clear warnings that the Metal Mesh T Shirt could cause serious injury or death if worn independent of and not paired with other personal protective equipment in an environment where knife injuries were a known hazard.

Case ID: 210201548

320.    Mr. Htoo was unaware of the defective nature of the Metal Mesh T Shirts (both the design defect and warning defect) and was otherwise unaware of the Metal Mesh T Shirt's unreasonably dangerous and/or unsafe condition.

321.    At the time of the incident, the Metal Mesh T Shirt failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner because of the defects described herein.

322.    At the time of the incident there were Kevlar head, neck and chest PPE in the marketplace that provided head, neck and chest protection from potential knife injuries.

323.    At the time of the incident, other companies designed, manufactured, marketed and sold head, neck and chest personal protection equipment that provided head, neck and chest protection from potential knife injuries.

324.    The Honeywell Defendants' Metal Mesh T Shirts' defects (both in design and lack of adequate warnings) were a proximate cause of Mr. Htoo's injuries, which ultimately led to his death.

WHEREFORE, Plaintiff demands judgment in her favor for all compensatory damages, including, but not limited to, compensation for pain and suffering, compensation for limitation and preclusion from performing normal activities, compensation for loss of health, compensation for medical expenses, and any further relief to which the Plaintiff is justly entitled at law or in equity.

57

Case ID: 210201548

## COUNT VIII – NEGLIGENCE

### PLAINTIFF V. HONEYWELL INTERNATIONAL, INC. AND
### HONEYWELL SAFETY PRODUCTS USA, INC.

325.    The paragraphs and allegations stated above are incorporated herein by reference as if the same were set forth fully herein.

326.    The Honeywell Defendants provided their Metal Mesh T Shirts specifically for use by beef processing plant workers as their work personal protective equipment.

327.    There were no warnings inside these Honeywell Metal Mesh T Shirts.

328.    The Honeywell Defendants' negligence in providing Metal Mesh T Shirts to beef processing plant workers without pairing them with other personal protective equipment proximately caused Mr. Htoo's injuries.

329.    The Honeywell Defendants owed a duty to Mr. Htoo to provide a safe Metal Mesh T Shirt for a beef processing plant worker and/or to adequately warn Mr. Htoo of the dangers of the Metal Mesh T Shirts. The Honeywell Defendants breached that duty and their negligence includes, but is not limited to, the following:

> a.    Marketing an open unprotected head, neck and chest Metal Mesh T Shirts to a beef processing plant company;
>
> b.    Failing to suggest alternate and additional personal protective equipment made with head, neck and chest area protection;
>
> c.    Failing to pair the Metal Mesh T Shirts with other personal protective equipment with head, neck and chest protection;
>
> d.    Failing to provide a safe Metal Mesh T Shirt personal protective equipment for Mr. Htoo's work environment;

58

e.    Failing to attach adequate warnings to the Metal Mesh T Shirts personal protective equipment;

f.    Failing to include adequate warnings in the advertisement of the Metal Mesh T Shirts personal protective equipment to warn of its lack of head, neck and chest area protection and to pair it with other PPE to protect the head, neck and chest;

g.    Failing to adequately warn Plaintiff of the dangers of the Metal Mesh T Shirts personal protective equipment;

h.    Failing to adequately supervise their employees;

i.    Failing to provide adequate training to their employees;

j.    Failing to train users how to properly wear Metal Mesh T Shirt personal protective equipment;

k.    Failing to provide the proper size Metal Mesh T Shirt personal protective equipment;

l.    Failing to provide head, neck and chest protection;

m.    Failing to comply with applicable rules and regulations;

n.    Other acts deemed negligent and grossly negligent.

330.    These breaches were a proximate cause of Mr. Htoo's severe injuries, which resulted in physical pain, mental anguish, physical impairment, disfigurement, distress, and eventually his death.

WHEREFORE, Plaintiff demands judgment in her favor on behalf of the Estate of Bosco Htoo for all compensatory damages, including, but not limited to, compensation for pain and

Case ID: 210201548

suffering, compensation for limitation and preclusion from performing normal activities,

compensation for loss of health, compensation for medical expenses, and any further relief to

which the Plaintiff is justly entitled at law or in equity.

## COUNT IX - STRICT PRODUCTS LIABILITY

### PLAINTIFF V. HONEYWELL INTERNATIONAL, INC. AND
### HONEYWELL SAFETY PRODUCTS USA, INC.

331.    The paragraphs and allegations stated above are incorporated herein by

reference as if the same were set forth fully herein.

332.    On June 13, 2019 and before that date, the Honeywell Defendants supplied

some or all of the JBS Defendants' workers at the JBS Souderton plant with Honeywell

Defendants' Stainless Steel Mesh Body Protection Aprons ("Stainless Steel Mesh Body

Protection Aprons").

333.    The Honeywell Defendants' Stainless Steel Mesh Body Protection Aprons are

composed of steel with fabric straps.

334.    The Honeywell Defendants' Stainless Steel Mesh Body Protection Aprons were

designed to provide cut and slash resistance and provide protection against cuts and slashes.

335.    Upon information and belief, at the time of the incident, the Honeywell

Defendants' Stainless Steel Mesh Body Protection Aprons provided to the JBS Souderton's beef

processing plant workers (including Mr. Htoo) were sold by the Honeywell Defendants.

336.    Upon information and belief, the Honeywell Defendants actively marketed and

sold the type of Stainless Steel Mesh Body Protection Aprons that Mr. Htoo was wearing at the

time of the incident.

60

337.    Upon information and belief, the Honeywell Defendants, either directly or through a third party, marketed, sold, or provided the Stainless Steel Mesh Body Protection Aprons that Mr. Htoo was wearing at the time of the incident, to the JBS Souderton workers to wear.

338.    The Honeywell Defendants knew or should have known that the Stainless Steel Mesh Body Protection Aprons that were provided to the workers at the JBS Defendants' beef processing plant were not fit for the intended use—to be worn independent of other head, neck and chest personal protective equipment inside a beef processing plant where a high risk of knife injury hazards is known.

339.    The Honeywell Defendants knew or should have known that the Stainless Steel Mesh Body Protection Apron they provided to Mr. Htoo to wear at the JBS Souderton's beef processing plant was dangerous for the use for which it was supplied.

340.    The Honeywell Defendants should not have supplied the Stainless Steel Mesh Body Protection Aprons or allowed the Stainless Steel Mesh Body Protection Aprons to be supplied to a beef processing plant without pairing it with other personal protective equipment that provides head, neck and chest protection where there is a high risk of knife injuries and hazards.

341.    The Honeywell Defendants knew or should have known that their Stainless Steel Mesh Body Protection Aprons would leave the head, neck and chest area of the intended user's skin unprotected in case of exposure to knife injuries in a meat processing plant.

342.    Despite knowing that their Stainless Steel Mesh Body Protection Aprons (including the Stainless Steel Mesh Body Protection Apron worn by Mr. Htoo on the date of the

Case ID: 210201548

incident) were defectively designed for use in a beef processing plant independent of other personal protective equipment, the Honeywell Defendants nevertheless provided the Stainless Steel Mesh Body Protection Aprons knowing that the Stainless Steel Mesh Body Protection Aprons would be used independent of other personal protective equipment in a beef processing plant.

343.    As a worker at the JBS Souderton beef processing plant, Mr. Htoo was an intended and reasonably foreseeable user of the Honeywell Defendants' Stainless Steel Mesh Body Protection Aprons.

344.    Mr. Htoo used the Honeywell Defendants' Stainless Steel Mesh Body Protection Apron in an intended and reasonably foreseeable manner.

345.    The Honeywell Defendants designed, configured, manufactured, marketed, produced, sold, supplied, transported, delivered, distributed, and otherwise placed the Stainless Steel Mesh Body Protection Aprons in the market for sale.

346.    By placing the Stainless Steel Mesh Body Protection Aprons into the stream of commerce, the Honeywell Defendants represented that it could be safely used as personal protective equipment in the food processing industry.

347.    The Stainless Steel Mesh Body Protection Apron did not undergo any change in condition as supplied by Honeywell Defendants.

348.    However, the Stainless Steel Mesh Body Protection Apron was unsafe for its intended use that existed prior to such time as the personal protective equipment was received by Mr. Htoo.

Case ID: 210201548

349.    Specifically, the Stainless Steel Mesh Body Protection Apron was defectively designed because it was provided for use in an environment where knife injuries are a known hazard. The Stainless Steel Mesh Body Protection Apron should have been paired with other personal protection equipment to cover the head, neck and chest areas of the user.

350.    Additionally, the Stainless Steel Mesh Body Protection Apron was defective because the warning label inside the Stainless Steel Mesh Body Protection Apron failed to provide any warnings and the Honeywell Defendants otherwise failed to warn the ultimate users regarding the dangers of wearing the Stainless Steel Mesh Body Protection Apron independent of other head, neck and chest personal protective equipment in an environment where there is a risk of knife injuries. The warning should have stated clear warnings that the Stainless Steel Mesh Body Protection Apron could cause serious injury or death if worn independent of and not paired with other personal protective equipment in an environment where knife injuries were a known hazard.

351.    Mr. Htoo was unaware of the defective nature of the Stainless Steel Mesh Body Protection Aprons (both the design defect and warning defect) and was otherwise unaware of the Stainless Steel Mesh Body Protection Apron's unreasonably dangerous and/or unsafe condition.

352.    At the time of the incident, the Stainless Steel Mesh Body Protection Apron failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner because of the defects described herein.

353.    At the time of the incident there were Kevlar head, neck and chest PPE in the marketplace that provided head, neck and chest protection from potential knife injuries.

63

Case ID: 210201548

354.    At the time of the incident, other companies designed, manufactured, marketed and sold head, neck and chest personal protection equipment that provided head, neck and chest protection from potential knife injuries.

355.    The Honeywell Defendants' Stainless Steel Mesh Body Protection Apron's defects (both in design and lack of adequate warnings) were a proximate cause of Mr. Htoo's injuries, which ultimately led to his death.

WHEREFORE, Plaintiff demands judgment in her favor for all compensatory damages, including, but not limited to, compensation for pain and suffering, compensation for limitation and preclusion from performing normal activities, compensation for loss of health, compensation for medical expenses, and any further relief to which the Plaintiff is justly entitled at law or in equity.

### COUNT X – NEGLIGENCE

#### PLAINTIFF V. HONEYWELL INTERNATIONAL, INC. AND HONEYWELL SAFETY PRODUCTS USA, INC.

356.    The paragraphs and allegations stated above are incorporated herein by reference as if the same were set forth fully herein.

357.    The Honeywell Defendants provided their Stainless Steel Mesh Body Protection Aprons specifically for use by beef processing plant workers as their work personal protective equipment.

358.    The were no warnings inside these Honeywell Stainless Steel Mesh Body Protection Aprons.

Case ID: 210201548

359.    The Honeywell Defendants' negligence in providing Stainless Steel Mesh Body
Protection Aprons to beef processing plant workers without pairing them with other personal
protective equipment proximately caused Mr. Htoo's injuries.

360.    The Honeywell Defendants owed a duty to Mr. Htoo to provide a safe Stainless
Steel Mesh Body Protection Apron for a beef processing plant worker and/or to adequately
warn Mr. Htoo of the dangers of the Stainless Steel Mesh Body Protection Aprons. The
Honeywell Defendants breached that duty and their negligence includes, but is not limited to,
the following:

        a.     Marketing an open unprotected head, neck and chest Stainless Steel
             Mesh Body Protection Aprons to a beef processing plant company;

        b.     Failing to suggest alternate and additional personal protective equipment
             made with head, neck and chest area protection;

        c.     Failing to pair the Stainless Steel Mesh Body Protection Aprons with other
             personal protective equipment with head, neck and chest protection;

        d.     Failing to provide a safe Stainless Steel Mesh Body Protection Apron
             personal protective equipment for Mr. Htoo's work environment;

        e.     Failing to attach adequate warnings to the Stainless Steel Mesh Body
             Protection Aprons personal protective equipment;

        f.     Failing to include adequate warnings in the advertisement of the
             Stainless Steel Mesh Body Protection Aprons personal protective
             equipment to warn of its lack of head, neck and chest area protection
             and to pair it with other PPE to protect the head, neck and chest;

65

g.      Failing to adequately warn Plaintiff of the dangers of the Stainless Steel

Mesh Body Protection Aprons personal protective equipment;

h.      Failing to adequately supervise their employees;

i.      Failing to provide adequate training to their employees;

j.      Failing to train users how to properly wear Stainless Steel Mesh Body

Protection Apron personal protective equipment;

k.      Failing to provide the proper size Stainless Steel Mesh Body Protection

Apron personal protective equipment;

l.      Failing to provide head, neck and chest protection;

m.      Failing to comply with applicable rules and regulations;

n.      Other acts deemed negligent and grossly negligent.

361.    These breaches were a proximate cause of Mr. Htoo's severe injuries, which

resulted in physical pain, mental anguish, physical impairment, disfigurement, distress, and

eventually his death.

WHEREFORE, Plaintiff demands judgment in her favor on behalf of the Estate of Bosco

Htoo for all compensatory damages, including, but not limited to, compensation for pain and

suffering, compensation for limitation and preclusion from performing normal activities,

compensation for loss of health, compensation for medical expenses, and any further relief to

which the Plaintiff is justly entitled at law or in equity.

Case ID: 210201548

## COUNT XI – NEGLIGENCE

### PLAINTIFF V. JBS S.A., JBS USA HOLDINGS, INC.,
### JBS USA, LLC, JBS USA FOOD COMPANY HOLDINGS,
### and JBS USA FOOD COMPANY

362.    Plaintiff hereby incorporates all preceding paragraphs of this Complaint by reference.

363.    On June 13, 2019, the JBS Defendants oversaw operations at the JBS Souderton plant.

364.    On June 13, 2019, the JBS Defendants oversaw safety at the JBS Souderton plant.

365.    On June 13, 2019 and before that date, the JBS Defendants oversaw safety precautions and procedures at the JBS Souderton plant, including those related to training, knife sharpening, knife selection and personal protective equipment.

366.    On June 13, 2019 and before that date, oversight of the operations and safety decisions at the JBS Souderton plant were not limited to JBS Souderton, Inc. Instead, key operations and decisions were overseen by the JBS Defendants' corporate representatives at the parent level.

367.    On June 13, 2019 and before that date, the specific decisions related to whether or not to provide PPE, what PPE to provide, how and when knives are sharpened, knife selection and whether or not to take other safety measures at the JBS Souderton plant were overseen by the corporate leaders of the JBS Defendants.

368.    On June 13, 2019 and before that date, in connection with their oversight of the JBS Souderton plant, the JBS Defendants developed plans, recommendations, guidance, and safety procedures for the JBS Souderton plant.

Case ID: 210201548

369.    On June 13, 2019 and before that date, the JBS Defendants, having possession and control of the JBS Souderton plant and the work being done there, owed a duty to all those working at the JBS Souderton plant, including Mr. Htoo, a business invitee, to provide a reasonably safe work environment, free from unreasonable and dangerous hazards.

370.    On June 13, 2019, the JBS Defendants selected, approved and required for Mr. Htoo to wear a Stainless Steel Mesh Apron in connection with his work as a meat cutter.

371.    The Stainless Steel Mesh Apron the JBS Defendants selected, approved and required for to Mr. Htoo to wear on June 13, 2019 at the time of the incident was manufactured and supplied by the PIP Defendants.

372.    On June 13, 2019, the JBS Defendants selected, approved and required for Mr. Htoo to wear a One-Piece Long Sleeve Metal T-shirt in connection with his work as a meat cutter.

373.    The One-Piece Long Sleeve Metal T-shirt the JBS Defendants selected, approved and required for Mr. Htoo to wear on June 13, 2019 at the time of the incident was manufactured and supplied by the PIP Defendants.

374.    On June 13, 2019, the JBS Defendants selected, approved and required for Mr. Htoo a Stainless Steel Mesh Body Protection Apron to wear in connection with his work as a meat cutter.

375.    The Stainless Steel Mesh Body Protection Apron the JBS Defendants selected, approved and required for Mr. Htoo to wear on June 13, 2019 at the time of the incident was manufactured and supplied by the Honeywell Defendants.

Case ID: 210201548

376.    On June 13, 2019, the JBS Defendants selected, approved and required for Mr. Htoo a Metal Mesh T Shirt to wear in connection with his work as a meat cutter.

377.    The Metal Mesh T Shirt the JBS Defendants selected, approved and required for to Mr. Htoo to wear on June 13, 2019 at the time of the incident was manufactured and supplied by the Honeywell Defendants.

378.    On June 13, 2019, the JBS Defendants selected, approved and required for Mr. Htoo to wear an Aramark GO1037 butcher coat in connection with his work as a meat cutter.

379.    The butcher coat the JBS Defendants selected, approved and required for Mr. Htoo to wear on June 13, 2019 at the time of the incident was manufactured and supplied by the Aramark Defendants.

380.    On June 13, 2019, JBS Souderton plant employees moved Mr. Htoo from the fabrication floor where he was injured to a JBS Souderton plant office.

381.    On June 13, 2019, JBS Souderton plant employee Jennifer Roth provided medical care to Mr. Htoo after the incident.

382.    The negligence, gross negligence, carelessness and recklessness of the JBS Defendants, their agents, servants, and/or employees, which was a cause of Mr. Htoo's death, consisted of, but was not limited to, the following:

        a.    Selecting, approving and requiring an unprotected head, neck and chest PIP defendants' One-Piece Long Sleeve Metal T-shirt for Mr. Htoo to wear on June 13, 2019;

Case ID: 210201548

b.   Failing to pair the PIP Defendants' One-Piece Long Sleeve Metal T-shirt with other personal protective equipment that protected the head, neck and chest areas.

c.   Selecting approving and requiring an unprotected neck and chest PIP Defendants' Stainless Steel Mesh Apron for Mr. Htoo to wear on June 13, 2019;

d.   Failing to pair the PIP Defendants' Stainless Steel Mesh Apron with other personal protective equipment that protected the head, neck and chest areas.

e.   Selecting, approving and requiring an unprotected head, neck and chest Honeywell Defendants' Metal Mesh T Shirt for Mr. Htoo to wear on June 13, 2019;

f.   Failing to pair the Honeywell Defendants' Metal Mesh T Shirt with other personal protective equipment that protected the head, neck and chest areas;

g.   Selecting, approving and requiring an unprotected neck and chest Honeywell Defendants' Stainless Steel Mesh Body Protection Apron for Mr. Htoo to wear on June 13, 2019;

h.   Failing to pair the Honeywell Defendants' Stainless Steel Mesh Body Protection Apron with other personal protective equipment that protected the head, neck and chest areas;

Case ID: 210201548

i.      Failing to select, approve and require personal protective equipment for Mr. Htoo that provided head, neck and chest area protection;

j.      Failing to select, approve and require a face shield and balaclava for Mr. Htoo that provided head, neck and chest area protection;

k.      Selecting, approving and requiring an unprotected head, neck and chest Aramark Butcher Coat for Mr. Htoo to wear on June 13, 2019;

l.      Failing to select, approve and require a safe uniform and personal protective equipment for Mr. Htoo's work environment;

m.     Failing to adequately warn Mr. Htoo of the dangers and limitations of his uniform and personal protective equipment;

n.      Failing to adequately supervise their workers;

o.      Failing to provide adequate training to their workers;

p.      Failing to provide procedures and guidance on how to properly wear and size uniforms and personal protective equipment;

q.      Failing to select, approve and require the proper size uniform and personal protective equipment;

r.      Failing to select, approve and require head, neck and chest protection;

s.      Failing to comply with applicable JBS rules and other regulations;

t.      Ignoring the safety hazard of dull knives;

u.      Ignoring the risks of dull knives causing serious injuries and death of workers at the JBS Souderton plant;

71

Case ID: 210201548

v.    Failing to enforce JBS Defendants' knife sharpening policies at the JBS
      Souderton plant;

w.    Failing to have an appropriate knife sharpening program at the JBS
      Souderton plant;

x.    Intentionally ignoring the fact that workers at the JBS Souderton plant
      were using and being injured by dull knives for years;

y.    Failing to select, approve and require appropriate uniforms and personal
      protective equipment at JBS Souderton plant prior to and on June 13,
      2019;

z.    Failing to select, approve and require for workers uniforms and personal
      protective equipment to help prevent knife injuries at the JBS Souderton
      plant;

aa.   Ignoring and failing to address workers' numerous complaints of dull
      knives at the JBS Souderton plant;

bb.   Ignoring workers complaining of being given improper knives at the JBS
      Souderton plant;

cc.   Failing to implement policies and procedures that mandated knives
      remain sharp at the JBS Souderton plant;

dd.   Failing to have a proper maintenance of tools program in place at the JBS
      Souderton plant;

Case ID: 210201548

ee.     Failing to have appropriate policies to train employees including line
        leaders and supervisors how to sharpen knives at the JBS Souderton
        plant;

ff.     Failing to have appropriate policies to train workers how to replace
        knives at the JBS Souderton plant;

gg.     Failing to have a knife rotational or replacement program to ensure only
        sharp knives are used in production at the JBS Souderton plant;

hh.     Failing to have appropriate policies to ensure dull knives are not
        recirculated into production at the JBS Souderton plant;

ii.     Failure to periodically review and consider additional work practices to
        avoid injuries at the JBS Souderton plant;

jj.     Failing to have appropriate policies to provide workers with clear
        guidelines for when to stop working due to dull knives at the JBS
        Souderton plant;

kk.     Breaching their duties under various sections of the Restatement
        (Second) of Torts, including, but not limited to, § 340, et seq.; § 341, et
        seq.; and § 500, et seq.

ll.     Failing to provide Mr. Htoo with a safe place to work at the JBS
        Souderton plant;

mm.     Failing to have appropriate policies to properly train their workers and
        employees of subcontractors about the danger posed by dull knives,

Case ID: 210201548

incorrect size knives and the necessary methods to sharpen knives at the JBS Souderton plant;

nn.     Failing to have appropriate policies to properly train and supervise their workers and employees of subcontractors about the danger posed by dull knives and the methods to sharpen knives in their native language at the JBS Souderton plant;

oo.     Failing to have appropriate policies to warn and train Mr. Htoo and other JBS Souderton plant workers in their native language of the danger posed by lack of head, neck and chest personal protective equipment;

pp.     Failing to have appropriate policies to warn and train JBS Souderton plant workers in their native languages;

qq.     Failing to adopt, enact, employ, and enforce proper and adequate safety programs, precautions, procedures and measures at the JBS Souderton plant;

rr.     Failing to have appropriate policies to provide workers with adequate personal protection safety equipment at the JBS Souderton plant;

ss.     Failing to properly supervise and inspect the work being done at the JBS Souderton plant;

tt.     Failing to prevent workers at the JBS Souderton plant from being injured by knives;

Case ID: 210201548